NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

21-P-1096

GREGORY LEWANDOWSKI

vs.

CIVIL SERVICE COMMISSION & another.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff appeals from a Superior Court judgment affirming the decision of the Civil Service Commission (commission) which, in turn, affirmed the town of Charlton's (town or Charlton) termination of the plaintiff's employment in the Charlton Police Department (CPD).  The plaintiff primarily argues that he was deprived of due process because the stated reasons for his termination were pretextual, and because his firing was instead motivated by personal animus or bias against him.  He also contends that the commissioner who presided over the hearing should have reviewed, in camera, evidence over which the town claimed the attorney-client privilege.  We affirm.

---

[1] Town of Charlton.

Background.  Prior to his termination, the plaintiff served on the CPD during two relevant periods.  He first served as a part-time auxiliary police officer from July 2002 to December 2003.  After a brief stint at another police department, the plaintiff rejoined CPD as a full-time officer in September 2005.  The plaintiff was promoted to lieutenant in July 2013, and served in that role until his termination in October of 2018.

The plaintiff's termination followed a months-long investigation, the impetus of which was the plaintiff's receipt of a so-called "longevity payment" in November 2017.  As relevant here, the town once paid "longevity payments" to eligible CPD employees under a collective bargaining agreement (and a later memorandum of understanding) (collectively, CBA) between the town and the Charlton Police Alliance.  As of July 2016, the CBA provided for once-yearly payments of $200 to full-time employees who had reached ten years of service.  The yearly payments increased if the employee reached additional longevity milestones -- e.g., to $400 after fifteen years of service, and to $1,000 after twenty.  Under this structure, the plaintiff received his first $200 longevity payment in July 2016, and his second in July 2017.[2]

---

[2] Although the CBA did not entitle lieutenants to longevity payments, the plaintiff received such payments based on CPD practice.

2

In October 2017, the town added a new bylaw providing for yearly longevity payments to "any eligible employee," defined as "[o]ne who is currently employed by the [t]own and who is regularly scheduled to work a minimum of twenty . . . hours per week."[3]  As a result, in November 2017 the town's assistant human resources director circulated a "longevity chart" to a group of town employees (including the plaintiff), listing each eligible employee's start date, length of service, and the payment they were due that year.  The chart listed the plaintiff's start date as July 2002 (when he started as a part-time auxiliary officer) and showed that he was due a $200 payment based on fourteen years of service.  The plaintiff thereafter received a $200 longevity payment in November 2017, his second of that year.

In December 2017, CPD Chief Graham Maxfield discovered that the plaintiff had received two longevity payments in 2017, and asked the plaintiff for an explanation.  The plaintiff claimed that he received the second payment because he had reached an anniversary with the town.  In a subsequent written response (which Chief Maxfield had directed the plaintiff to provide), the plaintiff explained that he had received his first ten-year longevity payment in July 2016, that "the town had [him]

_____

[3] Under the 2017 bylaw, the ten-year and fifteen-year payments remained $200 and $400, respectively.  Unlike the CBA, lieutenants were covered by the bylaw.  See note 2, supra.

3

reaching [his] fifteen . . . year" anniversary in July 2017, and that he believed the November 2017 payment "was an adjustment" for hitting that milestone. This confused Maxfield, who did not understand how the plaintiff was eligible for a fifteen-year payment in July 2017, when he had received his first ten-year payment the prior year. After further inquiry, Maxfield learned that the plaintiff had not begun his full-time service with CPD until 2005, prompting him to ask the plaintiff how he had learned that he had reached his fifteen-year anniversary. The plaintiff pointed to the longevity chart, which showed fourteen (not fifteen) years of service.

Also in December 2017, the plaintiff sought and obtained forty additional hours of vacation time based on the 2002 start date shown in the longevity chart -- in the process representing to Maxfield (in response to Maxfield's question) that he had been at the CPD for fifteen years. Around that same time, the plaintiff contested the results of an audit of his available sick leave time, contending that his own audit showed that he had 1,186 hours available, not 904 hours as the town contended. Although Maxfield initially accepted the plaintiff's number, the town subsequently discovered that the plaintiff's audit had not accounted for sick days that the plaintiff had taken between 2005 and the beginning of July 2008. Sick leave taken before July of 2008 was not recorded in the town's computer system, but

4

only in physical books -- a fact of which the plaintiff was aware due to his oversight of prior CPD sick leave audits.

Eventually, in reviewing the circumstances that led to the plaintiff's November 2017 longevity payment, Maxfield learned that the plaintiff's start date in the longevity chart corresponded with his part-time auxiliary service, and not when he began as a full-time officer. Maxfield accordingly directed the plaintiff to remedy the extra longevity payment and increased vacation time with the human resources department. While the plaintiff asked the human resources department to deduct forty hours of vacation time, he did not raise the longevity payment. Maxfield subsequently learned that the plaintiff's service to the town had not been continuous -- that is, there was a gap between his service as a part-time auxiliary officer and when he was rehired full-time. Believing that the plaintiff had deliberately misled him, Maxfield resolved to investigate the matter further, and placed the plaintiff on administrative leave in April 2018.

In September 2018, after Maxfield had completed his investigation, there was a disciplinary hearing before a hearing officer appointed by the town. Based on the hearing officer's recommendations, the town's board of selectmen voted to terminate the plaintiff for just cause, citing, among other things, his improper receipt of two longevity payments in 2017;

5

his knowing use of an incorrect hire date to secure additional vacation time; his intentional inflation of accrued sick leave; and his lack of candor during the investigation.

The plaintiff appealed the town's decision to the commission pursuant to G. L. c. 31, § 43, and a hearing was held before a commissioner. The plaintiff argued that his termination was the product of disparate treatment, pointing to other town employees, including Maxfield, who had received inflated longevity payments but who were not fired. The plaintiff also argued that the investigation and his ultimate termination were motivated by personal animus and bias, and that the investigation was intended to manufacture a pretext to accomplish his termination.[4] The plaintiff claimed that Maxfield had a personal animus toward him because, over a decade earlier, the plaintiff had reported to a prior CPD chief that Maxfield, then a sergeant, was encouraging auxiliary officers to refuse paid details to show solidarity with the police union.

The commission affirmed the town's decision as supported by just cause under G. L. c. 31, § 43. The commission found that

---

[4] The plaintiff argued that an e-mail between Maxfield and town counsel -- which the town withheld as privileged -- would have evidenced the pretextual nature of the investigation. Maxfield sent the e-mail on the day that he placed the plaintiff on leave, referencing in a separate e-mail to the town administrator and human resources director that he had "forwarded" to town counsel a copy of the letter placing the plaintiff on leave.

6

the evidence failed to show that the plaintiff's termination was pretextual, or motivated by animus or bias. The commission also concluded that, although the plaintiff's acceptance of the second 2017 longevity payment did not alone support his termination, the plaintiff's additional conduct -- including his efforts to obtain extra vacation time, his attempts to secure inflated sick leave, and his lack of candor -- justified the town's decision. A judge of the Superior Court affirmed the commission's decision, and this appeal followed.

Discussion. On appeal, the plaintiff primarily contends that he was unconstitutionally deprived of his employment without due process of law. The plaintiff does not challenge the commission's findings directly, but rather urges that the town's investigation, and decision to fire him, was borne of personal animus and thus, allegedly, deprived him of a meaningful opportunity to be heard. The plaintiff also argues that the hearing commissioner erred by not reviewing in camera an e-mail between Maxfield and town counsel concerning the plaintiff's administrative leave, as to which the town claimed attorney-client privilege. We review the commission's decision under G. L. c. 31, § 44. Accordingly, the decision "will be upheld unless it is 'unsupported by substantial evidence[,] . . . arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law.'"

7

Boston Police Dep't v. Civil Serv. Comm'n, 483 Mass. 461, 469 (2019), quoting G. L. c. 30A, § 14 (7). "This standard of review is highly deferential to the agency on questions of fact and reasonable inferences drawn therefrom" (citation omitted). Brackett v. Civil Serv. Comm'n, 447 Mass. 233, 242 (2006).

As to the plaintiff's due process argument, we agree that "[t]enured civil servants," such as the plaintiff, "have a property interest in their employment, and must be afforded basic due process protections in . . . disciplinary proceedings" (citation omitted). Worcester v. Civil Serv. Comm'n, 87 Mass. App. Ct. 120, 124 (2015). Those "[c]onstitutional safeguards require" that a person in the plaintiff's position receive (1) notice of the charges against him, (2) (generally), a pretermination hearing, (3) "an explanation of the [town]'s evidence," and (4) "an opportunity . . . to present [his] side of the story." Id. at 124-125. He is also entitled to an impartial hearing. See Harris v. Board of Trustees of State Colleges, 405 Mass. 515, 521 (1989). Here, the plaintiff has no argument as to the fairness of the adjudicatory process itself; the plaintiff does not (and cannot) complain that he was deprived of notice, of a pretermination hearing, or of an explanation of the town's evidence -- nor does the plaintiff challenge the impartiality of the hearing or the commissioner. Instead, the thrust of the plaintiff's argument appears to be

8

that the process was necessarily "tainted" by a "purely pretextual" investigation that was motivated by animus and bias. We do not agree that due process was not afforded here.

To begin, the plaintiff's due process theory is based on the questionable premise that a biased investigation necessarily amounts to a due process violation. The plaintiff cites no case for this proposition, and there is some case law to the contrary. See Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 15 (1st Cir. 2011) ("investigat[or] . . ., unlike a decisionmaker, does not have to be neutral").[5] But in any event, here the plaintiff was able to argue before the commission that the investigation and his termination were motivated by bias and animus, and that the stated reasons for his termination were pretextual. He thus had ample opportunity to "present [his] side of the story" (citation omitted). See Worcester, 87 Mass. App. Ct. at 125. The commission rejected those arguments on the facts, concluding that the evidence failed to show that the termination was "based on any . . . bias" or that the investigation was "a pretext to bring about the [plaintiff's] termination." The commission found, to the contrary, that the termination was based upon the plaintiff's multiple instances of

---

[5] Although an investigator's bias might give rise to rights under State law, see Cambridge v. Civil Serv. Comm'n, 43 Mass. App. Ct. 300, 304 (1997), the plaintiff does not press such an argument on appeal.

9

untruthfulness.  We give deference to such factual findings, Brackett, 447 Mass. at 242, which the plaintiff does not challenge as unsupported by the evidence.  See Matter of Eisenhauer, 426 Mass. 448, 453-454 (1998) (no due process violation absent evidence of biased decisionmakers).

This result is unaffected by the plaintiff's contention that he was subject to "inequitable treatment among similarly situated individuals" -- that is, other employees also received improper longevity payments but were not fired.  Here again, the plaintiff made this argument to the commission, which found that the plaintiff was "distinguish[able]," because "the record d[id] not show that those other employees engaged in multiple instances of untruthfulness," whereas the plaintiff took several actions that "called into question his honesty" and that "appeared designed to obfuscate."  Given those findings, there is no "basis to believe that the discharge penalty unfairly singled out [the plaintiff] for punishment more harsh or unusual than otherwise imposed in like circumstances." Police Comm'r of Boston v. Civil Serv. Comm'n, 39 Mass. App. Ct. 594, 601 (1995). See Moore v. Executive Office of the Trial Court, 487 Mass. 839, 850 (2021).

In a related argument, the plaintiff contends that the hearing commissioner erred by not reviewing, in camera, an e-mail that Maxfield sent to town counsel.  The plaintiff argues

10

that the e-mail either was not privileged, or was subject to a privilege exception, and that the e-mail would have supported his pretext argument. The town argues, and a judge of the Superior Court concluded, that the commissioner did not err by not reviewing the document. We agree.

The plaintiff requested the e-mail during prehearing discovery, apparently learning of its existence through review of a separate communication. The town did not produce the e-mail, and the commissioner denied the plaintiff's motion to compel its production. The plaintiff nonetheless renewed his request during the hearing. Outside counsel for the town represented that he had reviewed the e-mail, and expressed his belief that it was privileged.[6] Plaintiff's counsel asked the commissioner to review the document in camera, but the town objected. Plaintiff's counsel then responded: "If you don't want to supply the document, then we're entitled to an adverse inference." The commissioner then stated, before taking the matter under advisement:

> "Why don't you think about it and whether or not you want to have an in camera review. Take that in consideration of whether you want to do an in camera review or not. I don't know whether it's a big deal or not. But think about it, and then let me know, and I'll make a decision on it later."

---

[6] Outside counsel was not the "town counsel" to whom Maxfield sent the e-mail in question.

11

The issue was not raised again at the hearing.  In the plaintiff's posthearing submission (a draft "proposed decision"), the plaintiff noted his request to review the e-mail, but ultimately proposed that the commission "draw [an] adverse inference . . . that the evidence if produced would be prejudicial to the [t]own."

Under the circumstances, the plaintiff waived the argument he now pursues.  See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006) (issues not argued below waived on appeal).  Although the plaintiff initially requested an in camera review, after discussion the commissioner left to the plaintiff whether he wanted to pursue the argument.  The plaintiff did not follow up.  Although it is true that the plaintiff's posthearing submission noted the request for in camera review, the plaintiff did not propose any resolution other than asking for an adverse inference.  Where this was the plaintiff's only follow up to the

commissioner's clear direction, the commissioner cannot be faulted for not reviewing the e-mail.[7]

Judgment affirmed.

By the Court (Rubin,
Englander & Brennan, JJ.[8]),

*Joseph F. Stanton*

Clerk

Entered:  June 1, 2023.

---

[7] We also note that the plaintiff has marshalled no evidence supporting his theory that the e-mail evidenced pretext.  Under the circumstances, asking for an adverse inference may well have been a strategic choice.  The plaintiff and his counsel may have thought the better course was to ask for an adverse inference, rather than risk the possibility that in camera review would result in nothing -- or actually harm the plaintiff's case.

[8] The panelists are listed in order of seniority.