POLICE DEPARTMENT OF BOSTON vs. JILL KAVALESKI.

Suffolk. February 7, 2012. - November 6, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Police,* Hiring. *Public Employment,* Police, Psychiatric examination. *Civil Service,* Police, Decision of Civil Service Commission, Findings by commission. *Administrative Law,* Evidence, Findings, Hearing.

Discussion of the standard of review applicable to a decision of the Civil Service Commission regarding a public employer's decision to bypass a candidate for hiring. [688-689]

In a proceeding before the Civil Service Commission (commission) challenging the decision of a police department (department) to bypass a candidate for employment as a police officer based on the candidate's interviews with psychiatrists, the commission erred in considering expert testimony from a different commission proceeding, where the commission did not alert the department that it would be looking to the testimony in that other proceeding and considering it as evidence in the present case, thus depriving the department of an opportunity to contest and respond to that evidence; however, the department was not prejudiced by the commission's reliance on the testimony from the other proceeding, where there was other substantial and reliable evidence in the record, independent of the testimony from the other proceeding, to support the commission's decision in the present case. [689-695]

CIVIL ACTION commenced in the Superior Court Department on November 23, 2009.

The case was heard by *Frank M. Gaziano,* J., on motions for judgment on the pleadings.

The Supreme Judicial Court granted an application for direct appellate review.

*Michael S. Rabieh* for the defendant.

*Nicole I. Taub* for the plaintiff.

DUFFLY, J. Since 2005, Jill Kavaleski has sought employment as a police officer with the Boston police department (department). The department has, on three occasions, extended conditional offers of appointment to Kavaleski, each of which was

contingent upon her successful completion of a psychological screening process. On each occasion, department psychiatrists found Kavaleski psychologically unqualified for the job, and the department "bypassed" her for appointment as a police officer. See G. L. c. 31, § 27. This case arises from the third such bypass, which Kavaleski appealed to the Civil Service Commission (commission). See G. L. c. 31, § 2 (b). After an evidentiary hearing, the commission concluded that the department had failed to meet its burden of establishing a reasonable justification for bypassing Kavaleski, and ordered that her name be restored to the department's list of individuals certified for appointment. The department filed an appeal in the Superior Court, see G. L. c. 31, § 44, arguing that, in reaching its decision, the commission had erroneously relied on expert testimony from an unrelated proceeding. A Superior Court judge ruled that the commission had erred and vacated the commission's order. We granted Kavaleski's application for direct appellate review.

We agree that the commission erred in the manner in which it considered expert testimony from another proceeding. Because the commission's decision was supported by substantial evidence independent of this extraneous evidence, however, we conclude that the error did not prejudice the department. Accordingly, we reverse the Superior Court judge's order.

*Background.*[1] Kavaleski is a lifelong resident of Boston. She has received two graduate degrees from a local university, and has for many years been employed by the city of Boston's veterans' services department.[2] She has never been diagnosed as having, and has never received treatment for, any psychiatric or psychological disorder or condition.

In 2002, Kavaleski applied to be a police officer in New York. She passed that State's civil service examination, a background investigation, and psychological screening, and was offered a position with the New York City police department. She declined that offer. In 2005, she applied for a position as a police officer with the department.

---

[1]The facts are drawn from the findings of the Civil Service Commission (commission) and other documents of record.

[2]At oral argument, counsel for Kavaleski stated that Kavaleski is now commissioned as an ensign in the United States Navy Reserve.

As is required of all applicants, Kavaleski completed the department's lengthy application packet, which requires extensive disclosures about many aspects of an applicant's life. She also submitted the required letters of reference, cooperated with a background investigation, and took a civil service examination administered by the Commonwealth's human resources division (HRD). Kavaleski passed the examination, and according to the commission, her references were "of the highest order." The commission summarized Kavaleski's references as describing "a dedicated and passionate person committed to public or community service, who exercises responsibility, good judgment and common sense in the completion of her tasks."

In 2006, Kavaleski twice received a conditional offer of appointment from the department, but on each occasion was "bypassed"[3] after being deemed psychologically unqualified by department psychiatrists. In early 2007, the department extended a third conditional offer of appointment to Kavaleski.[4] The sole condition of the third offer was, again, that Kavaleski successfully complete the department's psychological screening process.[5]

The department's psychological screening process has three

---

[3]In the context of civil service hiring and promotions, a "bypass" refers to a decision by the appointing authority (here, the Boston police department [department]) to hire someone other than the highest-ranking available candidate. A candidate's rank is determined by his or her performance on the civil service examination. See *Bielawski* v. *Personnel Adm'r of Div. of Personnel Admin.*, 422 Mass. 459, 460 (1996). Pursuant to G. L. c. 31, § 27, the appointing authority must submit a written statement of reasons for the bypass to the Commonwealth's human resources division (HRD); the bypass is not effective until HRD accepts or approves the appointing authority's stated reasons. See *MacHenry* v. *Civil Serv. Comm'n*, 40 Mass. App. Ct. 632, 635-636 (1996).

[4]Kavaleski did not submit three separate applications to the department. Rather, the department uses an eligibility list generated from a single administration of the civil service examination for multiple hiring cycles. Because Kavaleski expressed her willingness to accept employment as a police officer during each hiring cycle, her name remained on the department's "eligible list" for certification, or list of individuals certified for appointment. See G. L. c. 31, § 25.

[5]To comport with the requirements of the Massachusetts antidiscrimination law, G. L. c. 151B, § 4 (16), and provisions of the Americans with Disabilities Act, 42 U.S.C. § 12112(d) (2006), an employer may not conduct medical or psychological testing prior to making an offer of employment, but may condition an offer of employment on the successful completion of such testing. The only permissible purpose for which these tests may be used is to

"phases." In "Phase I," candidates for employment must take two standardized tests: the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and the Personality Assessment Inventory (PAI).[6] In "Phase II," candidates meet with one of the department's psychiatrists for a thirty-minute clinical interview (first-level interview). Before the interview, the psychiatrist reviews the candidate's MMPI-2 and PAI test results as well as material from the department's background investigation, the candidate's medical history, and information provided by the candidate in a biographical questionnaire. During the interview, the psychiatrist conducts a "mental status examination," explores any areas of concern raised by the testing and biographical data, and evaluates possible areas of "psychological vulnerability as it pertains to the essential functions of the police officer position." If this process raises no "suitability issues," the psychiatrist will report to the department in writing that the candidate is psychologically suitable for appointment as a police officer.

If the psychiatrist identifies areas requiring further inquiry, he or she will prepare a written report outlining the specific concerns and refer the candidate to "Phase III" of the screening process, a "second opinion psychiatric interview" (second-level interview). A different psychiatrist conducts the second-level interview. The second psychiatrist reviews the report from the first-level interview, as well as the test results and background material reviewed initially by the first psychiatrist. The second psychiatrist then conducts an "in-depth clinical interview" and makes a final written recommendation to the department regarding any "psychological/behavioral issues that would interfere with the applicant's performance of the essential job functions" of being a police officer.

The entire screening process operates in accordance with

___

determine "whether the employee, with reasonable accommodation, is capable of performing the essential functions of the job." G. L. c. 151B, § 4 (16).

[6]As defined in the department's proposed psychological screening plan (screening plan), the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) is a "567 item true-false questionnaire designed to identify psychopathology in clinical populations. [It] is the most widely researched psychological test in current use with [more] validity studies than any other instrument." The Personality Assessment Inventory (PAI) is a "344 item inventory that includes 11 clinical, [two] interpersonal and [four] validity scales."

rules promulgated by HRD. Those rules define the medical standards that a municipal police officer in the Commonwealth must meet, and sort disqualifying medical or psychiatric[7] conditions into two categories. A "Category A" condition is one "that would preclude an individual from performing the essential job functions of a municipal police officer or present a significant risk to the safety and health of that individual or others."[8] A "Category B" condition is one that, "based on its severity or degree, may or may not preclude an individual from performing the essential job functions of a municipal police officer, or present a significant risk to the safety and health of that individual or others."[9]

As noted, at the time of her appeal, Kavaleski had undergone the department's psychological screening process three times, and had completed the MMPI-2 and PAI during each round of screening. Both tests were scored automatically, using Kavaleski's responses to create a computer-generated report of her psychological "profile." According to the MMPI-2 reports from Kavaleski's first two rounds of testing, she produced "invalid" profiles because her responses were "too defensive to permit an adequate assessment of her psychological adjustment." In both rounds of screening, the first and second psychiatrists who evaluated Kavaleski after reviewing these "invalid" profiles reported that Kavaleski was defensive, guarded, or "interpersonally stiff."[10] The psychiatrists also took note of Kavaleski's ap-

---

[7]The rules promulgated by HRD refer to "psychiatric" conditions, whereas the department's screening plan refers to "psychological screening." The difference in terminology is immaterial in this case, and we use the terms as they appear in the record.

[8]Category A psychiatric conditions include disorders of behavior, anxiety disorders, disorders of thought, disorders of mood, and disorders of personality.

[9]The HRD rules list two Category B psychiatric conditions. The first is "a history of any psychiatric condition, behavior disorder, or substance abuse problem not covered in Category A," which "shall be evaluated based on that individual's history, current status, prognosis, and ability to respond to the stressors of the job." The second is "any other psychiatric condition that results in an individual not being able to perform as a police officer."

[10]With one exception, Kavaleski met with the same psychiatrists during each round of screening. Dr. Julia M. Reade served as the second-level psychiatrist in all three rounds. Dr. Andrew Brown conducted Kavaleski's initial first-level interview; Dr. Marcia Scott conducted the first-level interview during Kavaleski's second and third rounds of screening.

pearance, describing her as thin, with hair that was "messy" or "unkempt."

In the third round of testing, Kavaleski's responses produced a "valid" MMPI-2 profile. The computer-generated profile indicated that Kavaleski had "[i]ndorsed" certain test questions, known as "critical items," in the areas of acute anxiety, somatic symptoms, anxiety and tension, and deviant beliefs.[11] A similar computer-generated report based on Kavaleski's responses to the PAI noted that Kavaleski presented a "[l]ow risk" in the "[p]sychological rating risk factor" category, and that she had indorsed critical items relating to drug problems, anxiety, persecution, and aggressive attitude.[12]

Dr. Marcia Scott, who had interviewed Kavaleski in a previous round of screening, conducted Kavaleski's first-level interview on March 20, 2007. Scott reported that Kavaleski was "less guarded" than she had been in previous interviews, and was "able to respond appropriately to relevant personal questions." Scott also made various observations about Kavaleski's weight and appearance, noting Kavaleski's "almost cache[c]tic body"[13] and "messy" hair. Scott concluded her report by stating that Kavaleski "is a steady controlled person but has very limited self-awareness, little understanding of her motivations or emotional limitations and inflexible approaches to both internal and external stresses." Scott stated that Kavaleski's "capacity to evaluate situations and make effective judgments" would

---

[11]Certain statements in the MMPI-2 to which test takers must respond either "true" or "false" (e.g., "I believe I am no more nervous than most others") are defined by the MMPI-2 report as "critical items," the content of which "may indicate the presence of psychological problems when [i]ndorsed in the deviant direction." The report includes a proviso that the critical items were "developed for use in clinical settings" and that "caution should be used in interpreting critical items since responses to single items are very unreliable and should not be treated as scores on full-length scales."

[12]Like the MMPI-2, the PAI report instructs that "[o]ne should use caution when interpreting these item responses because single items are not as reliable as the scales to which they belong."

[13]"Cachectic" refers to one who suffers from "[w]eight loss, wasting of muscle, loss of appetite, and general debility that can occur during a chronic disease." American Heritage Dictionary of the English Language 267 (3d ed. 1992). There is no evidence to suggest that Kavaleski has ever suffered from any chronic disease or illness.

impair her ability to work as a police officer, and referred Kavaleski for a second-level interview with Dr. Julia M. Reade.[14]

Reade, who conducted each of Kavaleski's three second-level interviews, met with Kavaleski approximately three months later, on June 30, 2007. She described Kavaleski as "thin, but not unhealthy looking," and again noted that "her hair was messy." Reade stated that she had reviewed materials from Kavaleski's two previous rounds of psychological screening, and included in her report the critical items that Kavaleski had indorsed during the latest round of MMPI-2 and PAI testing. Reade described Kavaleski's demeanor during the interview as "impassive" and concluded her report as follows:

> "In summary, despite her continued effort to be more open and flexible, Ms. Kavaleski continues to present as a psychologically inflexible, interpersonally stiff woman whose extreme defensiveness limits her capacity to reflect on her own decision-making, responses, actions or impact on others. Her concrete cognitive style is equally limiting and is likely related to what appears to be a characterologic rigidity. These limitations would interfere with Ms. Kavaleski's ability to manage the duties of a Boston [p]olice officer."

Based on Reade's report, the department notified HRD that it intended to bypass Kavaleski because she had failed to meet the psychological criteria for employment as a police officer. HRD accepted the department's stated reasons, and on August 31, 2007, Kavaleski appealed to the commission pursuant to G. L. c. 31, § 2 (b).

A hearing was held before the commission on April 3, 2008, at which Kavaleski represented herself. The commission accepted numerous exhibits in evidence and heard testimony from Reade and Kavaleski. By a divided vote, the commission ruled that the department had not met its burden of establishing a reasonable justification for bypassing Kavaleski. The commission noted that a disqualifying psychiatric condition has not "been found to exist in [Kavaleski], nor has the [department]

---

[14]Kavaleski testified before the commission that her interview with Scott lasted approximately five minutes.

specifically asserted any such condition." The commission ordered the department to place Kavaleski's name "at the top of the eligibility list for original appointment to the position of [p]olice [o]fficer . . . so that she shall receive at least one opportunity for consideration from the next certification for appointment as a [department] police officer." The commission also ordered that, should the department choose to require Kavaleski to submit to further psychological screening, it must use psychiatrists other than those who had previously been involved in screening or evaluating her.

In reaching its decision, the commission quoted several written findings of fact that it had made in deciding the case of Roberts *vs*. Boston Police Dep't, Civil Serv. Comm'n, No. G1-06-321 (Sept. 25, 2008) (*Roberts*).[15] Like the present case, *Roberts* involved a psychological bypass by the department based on the candidate's interviews with Scott and Reade. The candidate in that case had called psychologists Dr. Mark S. Schaeffer and Dr. James C. Beck[16] to testify as expert witnesses, and the *Roberts* commission quoted extensively from their testimony in its written decision.[17]

Schaeffer testified in *Roberts* that interpreting MMPI-2 and PAI results "fall[s] within the professional discipline of psychology, as opposed to medicine and psychiatry." In discussing the psychiatrists' evaluations of Kavaleski in the present case, the commission quoted Schaeffer's testimony from *Roberts* as well as the *Roberts* commission's finding in that case that "all the expert witnesses who testified in [*Roberts*] agree that a *qualified psychologist* is the recommended professional with the necessary expertise to which a psychiatrist generally defers when it comes to the subject of psychological testing" (emphasis in original). The commission then noted that none of the

[15]The commission took "administrative notice" of its decision in Roberts *vs*. Boston Police Dep't, Civil Serv. Comm'n, No. G1-06-321 (Sept. 25, 2008) (*Roberts*). The decision was neither discussed nor introduced in evidence during the hearing in this case.

[16]Dr. James C. Beck is also licensed as a clinical, forensic, and teaching psychiatrist.

[17]It appears from the record that Dr. Mark S. Schaeffer and Beck have testified before the commission in a number of psychological bypass cases involving the department.

psychiatrists involved in interviewing Kavaleski had consulted a specially-trained psychologist to interpret her test results.[18] Based in part on these findings, the commission determined that Reade's conclusions about Kavaleski's psychological fitness for employment as a police officer were not credible.

The department filed an appeal in the Superior Court, pursuant to G. L. c. 31, § 44, arguing that the commission had improperly relied on *Roberts.* Concluding that the commission had erroneously relied on testimony introduced in the *Roberts* case in reaching its decision in the present case, a Superior Court judge allowed the department's motion for judgment on the pleadings and vacated the commission's decision.

*Standard of review.* When a candidate for appointment appeals from a bypass, the commission's role is not to determine whether that candidate should have been bypassed. Rather, the commission determines, "on the basis of the evidence before it, whether the appointing authority [has] sustained its burden of proving, by a preponderance of the evidence, that there was reasonable justification" for the decision to bypass the candidate. *Brackett* v. *Civil Serv. Comm'n,* 447 Mass. 233, 241 (2006), citing G. L. c. 31, § 2 (*b*). "Reasonable justification in this context means 'done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind, guided by common sense and by correct rules of law.' " *Brackett* v. *Civil Serv. Comm'n, supra,* quoting *Selectmen of Wakefield* v. *Judge of First Dist. Court of E. Middlesex,* 262 Mass. 477, 482 (1928). In determining whether the department has shown a reasonable justification for a bypass, the commission's primary concern is to ensure that the department's action comports with "[b]asic merit principles," as defined in G. L. c. 31, § 1.[19] See *Massachusetts Ass'n of Minority Law Enforcement Officers* v. *Abban,* 434 Mass. 256, 259 (2001). The com-

---

[18]The commission also quoted Beck's testimony, included in the *Roberts* decision, that a disqualifying "psychiatric condition," as defined in the HRD rules, should be understood to mean "some aspect of a person's behavior or trait that appears over a range of circumstances or in a variety of situations."

[19]"Basic merit principles" are defined as "(*a*) recruiting, selecting and advancing of employees on the basis of their relative ability, knowledge and skills including open consideration of qualified applicants for initial appointment; (*b*) providing of equitable and adequate compensation for all employees;

mission "finds the facts afresh" in conducting this inquiry and is not limited to the evidence that was before the department. *Beverly* v. *Civil Serv. Comm'n*, 78 Mass. App. Ct. 182, 187 (2010).

Pursuant to G. L. c. 31, § 44, we review the commission's decision to determine whether it was in conformity with the standards set forth in G. L. c. 30A, § 14 (7). See *Massachusetts Ass'n of Minority Law Enforcement Officers* v. *Abban*, *supra* at 263. We may set aside or modify the commission's decision if we conclude that "the substantial rights of any party may have been prejudiced" by a decision that is based on an error of law, unsupported by substantial evidence, or otherwise not in accordance with the law. G. L. c. 30A, § 14 (7). Because it is the department that appealed from the commission's decision, the department bears the burden of establishing that the decision is invalid. *Brackett* v. *Civil Service Comm'n*, *supra* at 242. That is a "heavy burden," *Massachusetts Ass'n of Minority Law Enforcement Officers* v. *Abban*, *supra* at 263-264, since we give "due weight to the experience, technical competence, and specialized knowledge" of the commission in deciding these matters. G. L. c. 30A, § 14 (7). "This standard of review is highly deferential to the agency on questions of fact and reasonable inferences drawn therefrom." *Brackett* v. *Civil Service Comm'n*, *supra*, quoting *Flint* v. *Commissioner of Pub. Welfare*, 412 Mass. 416, 420 (1992).

*Discussion.* The department advances two related arguments to support its claim that the commission's decision should be reversed. As stated, it contends that the commission erred as a matter of law in relying on testimony from *Roberts* to attack Reade's credibility. As a corollary, the department maintains

(*c*) providing of training and development for employees, as needed, to assure the advancement and high quality performance of such employees; (*d*) retaining of employees on the basis of adequacy of their performance, correcting inadequate performance, and separating employees whose inadequate performance cannot be corrected; (*e*) assuring fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion and with proper regard for privacy, basic rights outlined in this chapter and constitutional rights as citizens, and; (*f*) assuring that all employees are protected against coercion for political purposes, and are protected from arbitrary and capricious actions." G. L. c. 31, § 1.

that there was no properly admitted expert evidence to contradict Reade's testimony and that, therefore, the commission erred in substituting its own assessment of Kavaleski's psychological fitness for employment as a police officer. We agree that the commission should not have considered the expert testimony that was introduced in *Roberts*, but not for the reasons advanced by the department. In addition, we conclude that the commission was entitled to discredit Reade's testimony without hearing testimony from an opposing expert.

General Laws c. 30A, which governs proceedings before the commission, sets forth the extent to which an agency may rely on, and take notice of, materials other than those supplied by the parties. General Laws c. 30A, § 11 (4), provides, in relevant part:

> "All evidence, including any records, investigation reports, and documents in the possession of the agency of which it desires to avail itself as evidence in making a decision, shall be offered and made a part of the record in the proceeding, and no other factual information or evidence shall be considered . . . ."

A related provision, G. L. c. 30A, § 11 (5), authorizes agencies to "take notice of any fact which may be judicially noticed by the courts," as well as any "general, technical or scientific facts within their specialized knowledge." However, "[p]arties shall be notified of the material so noticed, and they shall be afforded an opportunity to contest the facts so noticed." *Id.* See *Assessors of Boston* v. *Ogden Suffolk Downs, Inc.*, 398 Mass. 604, 605-606 (1986).

The critical component of these statutory provisions is that parties be afforded notice of and an opportunity to respond to the evidence on which an agency relies in rendering a decision. See, e.g., *Doe, Sex Offender Registry Bd. No. 89230* v. *Sex Offender Registry Bd.*, 452 Mass. 764, 782 (2008) (agency erred in relying on psychiatric manual where petitioner not notified or afforded opportunity to refute that evidence); *New York Cent. R.R.* v. *Department of Pub. Works*, 354 Mass. 332, 336 (1968) (facts not properly before department where petitioner did not have opportunity to contest them). Thus, our concern with the commission's decision is not that the commission considered

testimony from a different commission proceeding, which it permissibly may do. See *Doherty* v. *Retirement Bd. of Medford*, 425 Mass. 130, 140 (1997) (upholding State agency's reliance on transcripts from Federal criminal proceedings where transcripts bore "reasonable indicia of reliability").[20] Contrast *Assessors of Boston* v. *Ogden Suffolk Downs, Inc., supra* at 606 (agency could not permissibly rely on determination of property values made in prior proceeding involving same party where prior decision was not supported by contemporaneous findings). Rather, the commission erred in failing to alert the department that it would be looking to Schaeffer's and Beck's testimony in *Roberts*, and considering it as evidence in the present case, thus depriving the department (and Kavaleski) of an opportunity to contest and respond to that evidence. Contrast *Doherty* v. *Retirement Bd. of Medford, supra* (agency introduced portions of transcript of prior criminal trial during hearing; defense counsel permitted to respond and to introduce other portions of transcript to question witness's credibility).

Although we conclude that the commission erred by considering testimony from *Roberts* without notice to the parties and an opportunity to respond, that does not end our inquiry. Pursuant to G. L. c. 30A, § 14 (7), we also determine whether, as a result of that error, "the substantial rights of any party may have been prejudiced."

We are satisfied that the department was not prejudiced by the commission's reliance on expert testimony from *Roberts*, because the commission's decision did not depend on that testimony. Although, as the Superior Court judge noted, the extraneous evidence "factored into" the commission's decision to discredit Reade's testimony regarding Kavaleski, the commission did not decide Kavaleski's appeal on that basis alone, and there was other substantial and reliable evidence in the record, independent of the testimony from *Roberts*, to support the commission's decision.[21] See *Assessors of Boston* v. *Ogden Suffolk Downs, Inc., supra* at 607-608 (even if expert witness's

---

[20]It is immaterial that the commission's references to *Roberts* consisted of quotations from a published decision of the commission rather than from a transcript of testimony at the proceeding.

[21]Although the commission also erred to the extent that it relied on Beck's

testimony not credited, other "reliable evidence" was sufficient to uphold agency's decision). The commission concluded that Reade's opinion was the result of arbitrary predispositions against Kavaleski, and that Reade (and, thus, the department) had based her determination on "unsubstantiated and subjective" criteria that lacked adequate factual support. This conclusion is supported by substantial evidence in the record. See G. L. c. 30A, § 14 (7). See also *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 526, 528 (1988) (agency's decision must be supported by substantial evidence).

" 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). "The standard is more stringent than abuse of discretion, and less than preponderance of the evidence; 'an agency's conclusion will fail judicial scrutiny if "the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary." ' " *Duggan* v. *Board of Registration in Nursing*, 456 Mass. 666, 674 (2010), quoting *Cobble* v. *Commissioner of the Dep't of Social Servs.*, 430 Mass. 385, 390-391 (1999).

The commission concluded that the department had bypassed Kavaleski based on mere conjecture, and that the evidence did not show that a disqualifying psychiatric condition "has been found to exist in [Kavaleski]." The commission emphasized the "indefiniteness and inconclusiveness" of the language employed by all the psychiatrists involved in Kavaleski's screenings. It observed that, in each of her interviews with Kavaleski, Reade had relied heavily on the earlier assessments of the first-level psychiatrists, repeating the "descriptive phrases" and "alleged observations or determinations" that had been made in prior reports. These earlier reports did not affirmatively state that Kavaleski suffered from any psychiatric disorder or condition but, rather, offered vague assessments that Kavaleski's profile

---

definition of a disqualifying "psychiatric condition" as "some aspect of a person's behavior or trait that appears over a range of circumstances or in a variety of situations," see note 18, *supra*, that definition was cumulative of other, properly admitted evidence. The HRD rules provide that a person's "history of any psychiatric condition" is to be evaluated "based on that individual's history, current status, prognosis, and ability to respond to the stressors of the job."

was "not inconsistent" with the presence of certain traits, that an eating disorder "may be present," and that it was "not possible to rule out" other emotional problems. The commission found that Reade's "testimonial tenor, tone and content indicated that she entirely adopted and affirmed" these earlier assessments, "attribut[ing] great weight and reliability to them," and that, by doing so, Reade had evidenced a predisposition to finding Kavaleski psychologically unsuitable. These findings and conclusions were based on substantial evidence other than that derived from *Roberts*.

Further, the commission expressed concern regarding Reade's repeated references to Kavaleski's physical appearance and "messy hair," as well as Scott's use of "extreme language" in referring to Kavaleski's appearance as cachectic. See note 13, *supra*. The commission found, based on Kavaleski's appearance at the hearing, that those descriptions were "clear misrepresentation[s]" and an "indication of some bias or some other improper consideration" by the department.[22] Observing that neither Reade nor the department asserted that Kavaleski would be unable to perform the essential functions of the job of a police officer, the commission determined that no disqualifying condition "has been found to exist in [Kavaleski], nor has the [department] specifically asserted" that one exists. It concluded:

> "Instead of determining the existence of a specific disqualifying condition, according to specified standards and proscribed process, Dr. Reade looks for her own subjectively determined qualifying traits. Dr. Reade's screening process is arbitrary and capricious, in contradiction of the basic merit principles of [G. L. c. 31]. The accuracy and reliability of the psychological screening process, as applied to [Kavaleski], is incapable of substantiation.

> "After considering all the credible and reliable evidence

---

[22]The commissioner's observation is supported by the record. In a "Human Resource Data Form" submitted as part of Kavaleski's application to the department, her longtime supervisor at the city of Boston's veterans' services department stated in response to the question, "How would you describe the applicant's personal appearance?" that Kavaleski "[a]lways presents herself in an impeccable appearance."

in the record, I conclude that the Boston [p]olice [d]epart-
ment did not have sound and sufficient reasons for bypass-
ing [Kavaleski] for selection as a police officer in the
[c]ity of Boston."

The department argues that, in making these findings, the
commission impermissibly "substituted its own lay person
opinion of Kavaleski" for that of Reade and the other experts
who had examined Kavaleski. This argument misstates the com-
mission's role as fact finder. "The commission, and not the
court, is the sole judge of the credibility and weight of the
evidence before it." *School Comm. of Brockton* v. *Massachusetts
Comm'n Against Discrimination*, 423 Mass. 7, 15 (1996). See
*Boston Police Superior Officers Fed'n* v. *Civil Serv. Comm'n*,
35 Mass. App. Ct. 688, 695 (1993).

The commission was entitled to discredit Reade's assessment
of Kavaleski even though Kavaleski offered no expert testimony
of her own. See, e.g., *Daniels* v. *Board of Registration in Med.*,
418 Mass. 380, 392 (1994), quoting *Commonwealth* v. *DeMi-
nico*, 408 Mass. 230, 235 (1990) ("[t]he law should not, and
does not, give the opinions of experts on either side of . . . [a]n
issue the benefit of conclusiveness, even if there are no contrary
opinions introduced at the trial"). See also *Boston Gas Co.* v.
*Assessors of Boston*, 334 Mass. 549, 579 (1956) ("That a person
qualifies as an expert does not endow his testimony with magic
qualities"). The commission properly explained on the record its
reasons for rejecting portions of Reade's testimony. Contrast
*Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App.
Ct. 634, 639-640 (1985), citing *New Boston Garden Corp.* v.
*Assessors of Boston*, 383 Mass. 456, 470 (1981) (where there is
uncontradicted expert testimony on subject beyond common
knowledge and experience of fact finder, agency may not reject
that testimony without providing basis for rejection in record).

Similarly, the commission was entitled to reject the depart-
ment's assertion that Reade's evaluation was sufficient to
disqualify Kavaleski. The commission appropriately recognized
that Reade's function in the psychological screening process
was narrowly circumscribed. Her sole task was to determine

whether Kavaleski had a psychiatric condition that would prevent her from performing, even with reasonable accommodation, the essential functions of the job.[23] See G. L. c. 151B, § 4 (16). The record supports the commission's conclusions that Reade's opinions were "substantially subjective determinations" that were "insufficiently factually supported," and that Reade did not provide a single "convincing situational example" to support her conclusion that Kavaleski's "defensiveness" and "characterologic rigidity" would interfere with police work in an "objective real-world context."[24]

Because the commission's conclusions were independent of its improper reliance on *Roberts* and are supported by substantial evidence in the record, the department has failed to meet its burden of establishing that the commission's decision was invalid pursuant to G. L. c. 30A, § 14 (7).

*Conclusion.* The order allowing the department's motion for judgment on the pleadings is reversed, and the judgment is set aside. The case is remanded to the Superior Court for entry of an order affirming the commission's decision.

*So ordered.*

---

[23]Where such a condition is credibly found to be present, it would constitute an adequate basis on which an appointing authority might justify a bypass.

[24]Contrary to the department's assertion, the commission did not "unilaterally determine whether [Kavaleski] is psychologically fit to be a police officer"; it concluded only that the department had not met its burden of establishing a reasonable justification for bypassing Kavaleski. Indeed, the commission authorized the department to conduct further psychological screening of Kavaleski, if the department deemed it necessary, so long as any screening is performed de novo by psychiatrists other than those involved in this case. While nothing in the HRD rules required further screening, we defer to the commission's decision in this case to permit such screening. See G. L. c. 30A, § 14 (7).