NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12746


TIMOTHY DEAL  vs.  MASSACHUSETTS PAROLE BOARD.



Middlesex.     November 5, 2019. - April 6, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
                    & Kafker, JJ.


Parole.  Imprisonment, Parole.  Administrative Law, Decision,
    Judicial review.




Civil action commenced in the Superior Court Department on
March 14, 2018.

The case was heard by C. William Barrett, J., on motions
for judgment on the pleadings.

The Supreme Judicial Court granted an application for
direct appellate review.


Merritt Schnipper (Barbara Kaban also present) for the
plaintiff.
Matthew P. Landry, Assistant Attorney General, for the
defendant.
David Rassoul Rangaviz, Committee for Public Counsel
Services, & Benjamin Niehaus, for Massachusetts Association of
Criminal Defense Lawyers & another, amici curiae, submitted a
brief.

BUDD, J.  The plaintiff, Timothy Deal, is serving a life sentence for committing murder in the second degree when he was seventeen.  He sought review of the parole board's (board's) denial of his application for parole in the Superior Court, alleging that the board abused its discretion by failing to analyze properly the "distinctive attributes of youth" in coming to its decision.  See Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 675 (2013) (Lenk, J., concurring) (Diatchenko I), quoting Miller v. Alabama, 567 U.S. 460, 472 (2012).  The judge entered judgment in favor of the board, and the plaintiff appealed.  We allowed Deal's application for direct appellate review, and for the reasons detailed infra, we affirm the judge's order allowing the board's motion for judgment on the pleadings.[1]

Background.  1.  Underlying facts.  We recount the facts as found by the board, supplemented by uncontested facts presented in Deal's parole application and hearing.  The victim and Deal were next-door neighbors and close friends.  In September 2001, the victim, who was facing drug charges, agreed to become an informant for police and purchased marijuana from Deal in a "controlled buy."  Based on information provided by the victim,

---

[1] We acknowledge the amicus brief submitted in support of Deal by the Massachusetts Association of Criminal Defense Lawyers and the youth advocacy division of the Committee for Public Counsel Services.

police secured a warrant to search Deal's home, where Deal shared a bedroom with his older brother, and subsequently arrested Deal and his brother on drug and firearm charges.

In January 2002, after Deal's release on bail, he and a companion went to the victim's home.  A fight ensued between Deal and the victim, during which Deal stabbed the victim multiple times.  The victim died from his wounds that evening. Two days after his arrest on murder charges, Deal telephoned the victim's mother; when she asked why he killed her son, Deal responded, "[The victim] was a snitch. . . .  [W]e tried to keep it from you."

Deal was seventeen years old at the time of the killing. He was indicted and tried for murder in the first degree, and a jury convicted him of the lesser included offense of murder in the second degree.  Deal was sentenced to life with the possibility of parole after fifteen years, making him eligible for parole in early 2017.

2.  The parole hearing.  Deal applied for parole in December of 2016.  In advance of his parole hearing, Deal submitted a memorandum describing his childhood, his rehabilitation, and his plans for housing and employment if paroled.  Deal also submitted a report by a forensic psychologist concluding that Deal would be a low risk for recidivism if paroled based on risk assessments and an interview

with Deal.  The application included submissions in support of parole from more than ten friends and family members, including the victim's mother.  The Boston police department and the district attorney for the Suffolk district submitted letters in opposition, both alleging that Deal killed the victim in retaliation for acting as an informant.

At the hearing in December 2016, Deal gave an opening statement apologizing to the victim's family and stating his responsibility and regret for the murder.  When asked to give his account of the killing, Deal stated that he had not planned or intended to kill the victim in retaliation for cooperating with police; rather, an argument over "something petty" escalated into a fight during which Deal grabbed a knife from a friend and then stabbed the victim multiple times.  Board members noted their concern that Deal may have killed the victim in retaliation for acting as a police informant, questioning in particular why, two days after Deal's arrest for murder, he called the victim's mother and told her the victim was a "snitch."  In response, Deal characterized the telephone call as an attempt to give context for why he, a close friend of the victim's family, ended up fighting and killing the victim.

In its written decision, the board denied parole and scheduled Deal's next review for December 2020, determining that Deal "[had] not demonstrated a level of rehabilitative progress

that would make his release compatible with the welfare of society," and that Deal's "version of the offense . . . [was] not plausible."  After exhausting his administrative appeals, Deal challenged the board's decision by bringing a complaint in the nature of certiorari in the Superior Court.  See Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12, 30 (2015) (Diatchenko II).  A judge in the Superior Court granted the board's motion for judgment on the pleadings and denied Deal's cross motion for the same, concluding that the board's decision was not an abuse of discretion.  We allowed Deal's application for direct appellate review.

Discussion.  General Laws c. 127, § 130, sets forth the standard the board is to apply when making parole decisions. The board may grant parole only where it finds,

> "after consideration of a risk and needs assessment, that there is a reasonable probability that, if the prisoner is released with appropriate conditions and community supervision, the prisoner will live and remain at liberty without violating the law and that release is not incompatible with the welfare of society."

Id.

The board is afforded significant deference with regard to its parole decisions.  As the granting of parole is a discretionary function of the executive branch, generally the judiciary's role is limited to reviewing the constitutionality of the board's decision and proceedings.  Commonwealth v. Cole,

468 Mass. 294, 302-303 (2014).  See, e.g., Crowell v. Massachusetts Parole Bd., 477 Mass. 106 (2017) (reviewing claims that parole decision violated constitution and statutes, and remanding for further development of record); Quegan v. Massachusetts Parole Bd., 423 Mass. 834 (1996) (reviewing constitutional claims that board may not consider refusal to admit guilt in parole determination); Doucette v. Massachusetts Parole Bd., 86 Mass. App. Ct. 531 (2014) (reviewing alleged due process violations in parole revocation proceeding, and conducting certiorari review of merits of board's decision to revoke parole).

Parole decisions for juvenile homicide offenders like the plaintiff are handled differently, however.  Unlike adult offenders, juveniles have "diminished culpability and greater prospects for reform, and, therefore, they do not deserve the most severe punishments," including sentences of life without parole (quotations omitted).  Diatchenko I, 466 Mass. at 659-660, citing Miller, 567 U.S. at 471.  "[B]ecause the brain of a juvenile is not fully developed, either structurally or functionally, by the age of eighteen, a judge cannot find with confidence that a particular offender, at that point in time, is irretrievably depraved."  Diatchenko I, supra at 670.  In particular, "[r]elying on science, social science, and common sense," the United States Supreme Court has pointed to three

"distinctive characteristics of youth" that make juveniles constitutionally different from adults for purposes of sentencing.  Id. at 660, 663.

These characteristics include what are commonly referred to as the Miller factors:  (1) children's "lack of maturity" and "underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) their "vulnerability to negative influences and outside pressures, including from their family and peers," and relatedly, their "limited control over their own environment" and inability to "extricate themselves from horrific, crime-producing settings"; and (3) their "unique capacity to change as they grow older" (alteration and quotations omitted).  Diatchenko II, 471 Mass. at 30, citing Diatchenko I, 466 Mass. at 660.  See Miller, 567 U.S. at 471.

Thus, we held that juvenile offenders who have been convicted of murder in the first degree may not be sentenced to life in prison without the possibility of parole.  Diatchenko I, 466 Mass. at 669-671.  We went on to hold that juvenile offenders sentenced to a mandatory term of life in prison, (i.e., those convicted of murder in the first or second degree) are entitled to a "meaningful opportunity to obtain release [on parole] based on demonstrated maturity and rehabilitation" (citation omitted).  Id. at 674.  See Commonwealth v. Okoro, 471

Mass. 51, 62-63 (2015); G. L. c. 119, § 72B. We further held that a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" means that the board must consider the "distinctive attributes of youth" in determining whether the juvenile is likely to reoffend. Diatchenko II, 471 Mass. at 23.

In addition, although in the normal course parole decisions are not subject to judicial review, Cole, 468 Mass. at 302-303, we have determined that to ensure that juvenile homicide offenders receive a meaningful opportunity for parole, they are entitled to judicial review of board decisions on their parole applications under the abuse of discretion standard.[2] Diatchenko II, 471 Mass. at 14, 31. "In this context, a denial of a parole application by the board will constitute an abuse of discretion only if the board essentially failed to take [the Miller] factors into account, or did so in a cursory way."[3] Id. at 31.

---

[2] Juvenile homicide offenders also must have access to counsel and access to funds to retain counsel and experts. Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12, 14 (2015) (Diatchenko II).

[3] This abuse of discretion standard is grounded in our balancing of the two constitutional considerations discussed supra: the fundamental imperative of proportionality in sentencing under art. 26 of the Massachusetts Declaration of Rights, and the "strict separation of judicial and executive powers" under art. 30. See Diatchenko II, 471 Mass. at 27-28.

The plaintiff contends that the board abused its discretion by denying him parole without more thoroughly analyzing various factors related to his youth.  Deal argues that in order to enable effective judicial review, and guarantee juvenile homicide offenders a meaningful opportunity to obtain release, the parole board's decisions must "expressly address in writing the youth-specific considerations present in each case, place that evidence in the context of the overall parole standard, and explain by reference to that evidence why the [b]oard nevertheless denied parole if it did."  The judge determined that "[w]hile the better practice may have been for the board to more specifically outline its findings and discussion in relation to the individual Miller factors, as opposed to its general statement that it considered them, such a level of detail is not required, particularly given the discretion afforded to the board."  Upon review, we conclude that the board did not abuse its discretion, as it adequately considered the requisite youth-related factors.[4]

In support of his argument, the plaintiff points to the fact that the board simply recites the Miller factors as among the considerations relevant to its decision without connecting those factors to any of the evidence presented at the hearing.

---

[4] We review the Superior Court judge's ruling de novo. Champa v. Weston Pub. Sch., 473 Mass. 86, 90 (2015).

We agree with the plaintiff and the concurrence that merely stating that the board considered the Miller factors, without more, would constitute a cursory analysis that is incompatible with art. 26 of the Massachusetts Declaration of Rights.  See Diatchenko II, 471 Mass. at 31.  However, upon review of the board's written decision, it is clear that the board's single mention of the Miller factors was not the beginning and end of the board's consideration of those factors.

The decision described various negative influences and stressors in Deal's environment leading up to the killing, including Deal's adult brother enlisting his aid in dealing drugs, his family's mounting financial and legal hardships, and his struggle to adapt to a change in schools.  Although the board did not explicitly state the connection, these facts clearly relate to Deal's "vulnerability to negative influences and outside pressures, including from [his] family and peers" and his "limited control over [his] own environment" (alteration and quotation omitted).  See Diatchenko II, 471 Mass. at 30, citing Miller, 567 U.S. at 471.  Further, although the board found that Deal's "version of the offense" was not plausible, its written decision acknowledged the "loss of friendship" and escalating confrontations between Deal and the victim stemming from Deal's arrest on information provided by the victim -- facts that illuminate the board's consideration of Deal's "lack

of maturity . . . leading to recklessness, impulsivity, and heedless risk-taking."  See Diatchenko II, supra.  Finally, the board's decision noted Deal's participation in various rehabilitative programs, employment, and religious activities while incarcerated, each of which pertains to Deal's "unique capacity to change as [he] grow[s] older."  See id.

Although the board's decision did not designate each fact to a particular attribute of youth, the decision's inclusion of these facts supports the board's certification that it did consider the Miller factors in a noncursory way.  Had the board expressly connected these facts to the Miller factors, there would have been no doubt that it gave thoughtful consideration to those factors.  Making these connections explicit, rather than implicit, will allow the board to make clear to reviewing courts that it gave due consideration to the Miller factors.

The plaintiff also argues that the board impermissibly based its decision on factors that are "irrelevant, or at least of diminished significance, to juvenile cases."  In particular, Deal contends that the board focused more on the conclusion that Deal's version of events was "not plausible" than on the attributes of youth.  The plaintiff's argument fundamentally misunderstands our holding in Diatchenko II.  Although we held that the board must consider the "distinctive attributes of youth" in order for a juvenile homicide offender to have a

"meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," we did not say that the board's decision had to rise or fall on those factors. See Diatchenko II, 471 Mass. at 23, 30. It is apparent from the decision that the board was primarily concerned about the plaintiff's failure to provide a "plausible" account of why he stabbed the victim fourteen years after he committed the crime. This concern is indicative of the plaintiff's incomplete "acknowledgement of his wrongdoing or . . . his refusal to acknowledge his guilt" -- considerations which may be relevant to rehabilitation, see Quegan, 423 Mass. at 836 -- rather than a rigid application of the traditional penological justifications (incapacitation, retribution, or deterrence), which are "suspect" as applied to juvenile sentences, see Diatchenko I, 466 Mass. at 670-671.[5] Further, the board's concern, noted in its decision, that Deal had not gone on record to take responsibility for the killing until ten years after the crime reinforces the board's legitimate reasoning that a longer period of rehabilitation

---

[5] Importantly, the board's written decision did not adopt the district attorney's argument that "[a] positive vote for parole . . . may send the wrong message to other criminals." Although the board noted its concern that Deal may have killed the victim in retaliation for being a "snitch," it did so in the context of Deal's rehabilitation, as evidenced by his possible lack of acknowledgment of the full severity of his crime.

would be necessary before release is compatible with the welfare of society.

The plaintiff argues as well that the board abused its discretion by denying parole without discussing the details of the risk assessment and report conducted by a forensic psychologist who concluded that Deal would be a low risk for recidivism if paroled. In its decision, the board noted that it "considered testimony" from the psychologist and that it "considered a risk and needs assessment," without discussing what the expert and risk assessment found or explaining why those findings were not enough to warrant parole. By denying parole on the grounds that Deal "[had] not demonstrated a level of rehabilitative progress that would make his release compatible with the welfare of society," the necessary implication is that, in the board's view, Deal's incomplete rehabilitation contradicted the risk assessment and the forensic psychologist's conclusion that Deal would be a low risk to recidivate. "[T]he opinion of a witness testifying on behalf of a sex offender need not be accepted by the hearing examiner even where the board does not present any contrary expert testimony." See Doe, Sex Offender Registry Bd. No. 68549 v. Sex Offender Registry Bd., 470 Mass. 102, 112 (2014), quoting Doe, Sex Offender Registry Bd. No. 10800 v. Sex Offender Registry Bd., 459 Mass. 603, 637 (2011). Nevertheless, the better practice,

as described in the concurrence, would be to articulate the reasons and evidence overcoming the contrary expert opinion.

As discussed supra, ultimately the board must determine whether there is "a reasonable probability" that the applicant would not recidivate if given the proper support, and that "release is not incompatible with the welfare of society."  See G. L. c. 127, § 130.  Although our review of parole decisions for juvenile homicide offenders is limited, we note that here, even taking into consideration youth-related factors, the board had reason to conclude that the plaintiff had failed to demonstrate a "level of rehabilitative progress that would make his release compatible with the welfare of society."  The Miller factors, although an important consideration, may or may not play a determinative role in the board's decision depending on the circumstances of a particular applicant.  In denying Deal's parole application, the board determined that Deal's incomplete rehabilitation, as evidenced by his failure to give a plausible account of his motivations for killing the victim, outweighed the favorable Miller evidence.  In future cases where, as here, evidence relevant to the Miller factors militates in favor of release but the board nevertheless denies parole, the better practice would be to specify the reasons and supporting facts that overcome the Miller considerations. Additionally, in light of the concerns raised by the concurrence, where the board bases

its denial of parole on a determination that the applicant's version of events is not plausible, the board should indicate both why that version is not plausible and how that implausibility bears on the applicant's likelihood to recidivate or the compatibility of release with the welfare of society.

Conclusion.  For the foregoing reasons, we conclude that the board's decision denying Deal's parole application was not an abuse of discretion.  The board based its decision on the statutory standard of rehabilitation and compatibility with the welfare of society, and its consideration of the distinctive attributes of youth was not merely cursory.  Accordingly, the Superior Court judge's order granting the board's motion for judgment on the pleadings and denying Deal's motion for the same is affirmed.

So ordered.

GANTS, C.J. (concurring, with whom Lenk, J., joins).  In Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 671 (2013) (Diatchenko I), we held that life imprisonment for a juvenile, even when convicted of murder, is cruel or unusual punishment in violation of art. 26 of the Massachusetts Declaration of Rights unless the juvenile has the possibility of being released on parole.  We also held that, when the juvenile becomes eligible for parole, the parole board (board) must provide the juvenile with a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  Id. at 674, quoting Graham v. Florida, 560 U.S. 48, 75 (2010).  And in Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12, 24-29 (2015) (Diatchenko II), we declared that a "meaningful opportunity to obtain release" requires not only a right to the assistance of counsel and a right to have access to the assistance of expert witnesses, but also a right of judicial review "to ensure that the board exercises its discretionary authority to make a parole decision for a juvenile homicide offender in a constitutional manner."

In Diatchenko II, supra at 30, we also articulated what it means for the board to exercise its discretionary authority in a constitutional manner.  Looking to the reasoning in Miller v. Alabama, 567 U.S. 460, 471 (2012), we stated that the board must consider that juveniles have "diminished culpability" for the

murder they committed because of the "distinctive attributes" of youth:  a "lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking; vulnerability to negative influences and outside pressures, including from their family and peers; . . . limited contro[l] over their own environment[;] . . . [and lack of] the ability to extricate themselves from horrific, crime-producing settings" (quotations and citation omitted).  Diatchenko II, supra.  The board must also consider that juveniles have the "unique capacity to change as they grow older" and therefore "greater prospects for reform" (citations omitted).  Id.  Unless the board considers these distinctive attributes of youth, as well as the consequences of aging into adulthood, the board denies the juvenile "a real chance to demonstrate maturity and rehabilitation."  Id.

The purpose of judicial review is to ensure that "the board has carried out its responsibility to take into account the attributes or factors just described in making its decision." Id.  Recognizing that "the decision whether to grant parole to a particular juvenile homicide offender is a discretionary determination by the board," we apply the abuse of discretion standard.  Id. at 31.  "[A] denial of a parole application by the board will constitute an abuse of discretion only if the

board essentially failed to take these factors into account, or did so in a cursory way."  Id.

We have yet to articulate how we can ensure that the board acted in a constitutional manner by providing a juvenile homicide offender a "meaningful opportunity to obtain release" after seriously considering the "distinctive attributes" of youth.  I conclude that the only way we can ensure that the board did not abuse its discretion is to require the board to show through its findings that it gave meaningful individualized consideration to these attributes of youth in reaching its decision.  I also conclude that the board's findings here fail to meet that requirement for three reasons.

First, the board's decision consists of three sections:  a statement of the facts of the underlying murder case, a statement describing the evidence presented at the parole hearing, and the "decision."  As shown by the appendix to the amicus brief submitted by the Massachusetts Association of Criminal Defense Lawyers and the youth advocacy division of the Committee for Public Counsel Services, apart from two sentences specific to Deal, the "decision" is boilerplate language used in virtually all forty-five of the juvenile homicide offender parole decisions it reviewed, with only the name of the juvenile

changed.[1]  Essentially, the board simply identifies the so-called

Miller factors and declares in all these cases that it

---

[1] The "decision" section is reprinted below, with the boilerplate language highlighted in bold:

**"The Board is of the opinion that Mr. Deal has not demonstrated a level of rehabilitative progress that would make his release compatible with the welfare of society.** The Board recommends that Mr. Deal partake in more programming, such as Criminal Thinking and Restorative Justice.  The Board believes that the version of the offense given by Mr. Deal is not plausible. **A longer period of positive institutional adjustment and programming would be beneficial to Mr. Deal's rehabilitation.**  The Board considered all factors relevant to the Diatchenko decision in making this determination.

**"The applicable standard used by the Board to assess a candidate for parole is:  'Parole Board Members shall only grant a parole permit if they are of the opinion that there is a reasonable probability that, if such offender is released, the offender will live and remain at liberty without violating the law and that release is not incompatible with the welfare of society.'  120 C.M.R. 300.04.  In the context of an offender convicted of first or second degree murder, who was a juvenile at the time the offense was committed, the Board takes into consideration the attributes of youth that distinguish juvenile homicide offenders from similarly situated adult offenders. Consideration of these factors ensures that the parole candidate, who was a juvenile at the time they committed murder, has 'a real chance to demonstrate maturity and rehabilitation.'  Diatchenko v. District Attorney for the Suffolk District, 471 Mass. 12, 30 (2015); See also Commonwealth v. Okoro, 471 Mass. 51 (2015).**

**"The factors considered by the Board include the offender's 'lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk taking; vulnerability to negative influences and outside pressures, including from their family and peers; limited control over their own environment; lack of the ability to extricate themselves from horrific, crime-producing settings; and unique capacity to change as they**

considered them, without demonstrating in any way how it considered them. I do not suggest that the board must provide a detailed analysis of each <u>Miller</u> factor, but it must do more than simply declare in a perfunctory manner that it considered them. There must be some meaningful individualized analysis, supported by evidence in the parole record, as to whether the <u>Miller</u> factors contributed to cause the parole applicant's participation in the murder, and as to whether his or her conduct while incarcerated has demonstrated that he or she has outgrown these attributes of youth through maturity and rehabilitation.

Second, under G. L. c. 127, § 130, a parole permit "shall be granted only if the board is of the opinion, after consideration of a risk and needs assessment, that there is a reasonable probability that, if the prisoner is released with appropriate conditions and community supervision, the prisoner

---

**grow older.' <u>Id</u>. The Board has also considered a risk and needs assessment, and whether risk reduction programs could effectively minimize Mr. Deal's risk of recidivism. After applying this standard to the circumstances of Mr. Deal's case, the Board is of the opinion that Mr. Deal is not yet rehabilitated, and his release is not compatible with the welfare of society. Mr. Deal, therefore, does not merit parole at this time.**

"Mr. Deal's next appearance before the Board will take place in four years from the date of this hearing. During the interim, the Board encourages Mr. Deal to continue working towards his full rehabilitation."

will live and remain at liberty without violating the law and that release is not incompatible with the welfare of society." Section 130, therefore, requires the board to make two determinations:  whether "the prisoner will live and remain at liberty without violating the law," and whether "release is not incompatible with the welfare of society."  Id.  The board effectively conflates the two by finding that Deal's "rehabilitative progress," which appears to be its proxy term for the risk of recidivism, falls short of what would be needed to make his release "compatible with the welfare of society."  I agree with the board that the prisoner's risk of recidivism is the determinative factor.  See, e.g., Crowell v. Massachusetts Parole Bd., 477 Mass. 106, 113 (2017) ("the board must be able to consider whether the symptoms of a prisoner's disability mean that he or she has a heightened propensity to commit crime while released on parole"); Diatchenko II, 471 Mass. at 23 ("The question the board must answer for each inmate seeking parole [is], namely, whether he or she is likely to reoffend . . ."); Jimenez v. Conrad, 678 F.3d 44, 46 (1st Cir. 2012) (no matter how good applicant's prison conduct may have been, parole shall be granted "only if" board finds that there is "reasonable probability" that prisoner will not violate law if granted release).

But, as the court notes, <u>ante</u> at   , the board's determination regarding Deal's risk of recidivism appears to rest primarily on its finding that Deal's description of his offense "is not plausible."  The board, however, fails to identify what it finds implausible about Deal's description. Deal accepted responsibility for the murder, expressed remorse for his role in it, and admitted that the victim's cooperation with the police, which resulted in Deal's arrest for drug and firearms possession, created substantial friction in what had once been a close relationship with a neighbor he had thought of as an older brother.  He also said that this was not the first time that he had visited the victim's house after learning that the victim had provided information to the police about him.

If the board believed that, despite his denials, Deal entered the victim's home on the day of the killing planning to kill him because of the victim's cooperation with the police, or that he stabbed the victim with the intent to kill, it should say so and identify the evidence in the parole record that supports such a finding.  It should be noted that Deal was charged with murder in the first degree on the theory of premeditation but found guilty only of murder in the second degree.  As a result, we can infer that the jury, after hearing the evidence at trial, had a reasonable doubt whether Deal acted with premeditation or with an intent to kill, or both.  Where,

as here, the jury did not convict the parole applicant of the crime charged, the board should act with caution and care before it concludes that the applicant was nonetheless guilty of the crime charged.

Moreover, even if the board had an adequate factual basis to conclude that the killing occurred differently from what was described by Deal, that alone cannot suffice to establish that Deal poses a significant risk of recidivism. Here, Deal accepted his guilt; the board only challenges his version of events. However, even if he had denied his guilt, there is little, if any, empirical support for a link between acceptance of guilt and a decreased likelihood of recidivism. See, e.g., Hanson & Morton-Bourgon, The Characteristics of Persistent Sexual Offenders: A Meta-Analysis of Recidivism Studies, 73 J. Consulting & Clinical Psych. 1154, 1159 (2005) (meta-analysis of sex offender recidivism studies concluding that denial of guilt "had little or no relationship with recidivism"); Harkins, Howard, Barnett, Wakeling, & Miles, Relationships Between Denial, Risk, and Recidivism in Sexual Offenders, 44 Archives Sexual Behav. 157, 157 (2015) ("the presumption that denial represents increased risk, which is common in much of the decision making surrounding sex offenders, should be reconsidered").

Even before these studies, we recognized the limited role that the failure to acknowledge guilt should play in a parole decision:  "The absence of such an acknowledgment [of guilt] provides no weight on the scale in favor of parole, and thus, in a sense, has a negative effect on a prisoner's parole application."  Quegan v. Massachusetts Parole Bd., 423 Mass. 834, 837 (1996).  And although we did not reach the question, we recognized that due process might forbid "denial of parole solely because a prisoner, who was otherwise fully qualified for release on parole, did not acknowledge his guilt."  Id.  Indeed, if a prisoner's failure to acknowledge guilt alone were to suffice to support a denial of parole, a prisoner wrongfully convicted of murder as a juvenile might never be paroled unless he or she falsely accepted responsibility for a crime he or she never committed.  See Medwed, The Innocent Prisoner's Dilemma: Consequences of Failing to Admit Guilt at Parole Hearings, 93 Iowa L. Rev. 491, 529 (2008) ("Proclaiming innocence at a parole hearing typically harms one's chances for release . . . while 'admitting' guilt can serve as a mitigating factor").

Third, § 130 requires the board to consider "a risk and needs assessment" in evaluating the prisoner's risk of recidivism.  G. L. c. 127, § 130.  The parole record reflects two risk assessments.  The first is the Department of Correction's own objective risk assessment, which assesses

Deal's risk of recidivism as low, and also assesses his criminal thinking, his anger, and his substance abuse as low. The second was conducted by Deal's expert witness, Dr. Ira Packer, who administered several tests, most importantly, the HCR-20 3d ed. (Historical, Clinical, Risk Management) Scale, which Packer described as "the most commonly used instrument for assessing violence risk" and which placed Deal at "low risk" for violent recidivism. Having conducted these tests, as well as a clinical interview, Packer reached the opinion that Deal "would be at low risk for recidivism if paroled."

At the parole hearing, parole member Dr. Charlene Bonner declared that she was "in forensics," and "in the world I'm in . . . [Packer is] regarded as . . . one of the best." Bonner also noted that Packer provided risk assessments that were "objective" and were "not an opinion," which were "very favorable" to Deal. She also noted that Packer "did something that a lot of evaluators won't do," and provided his opinion that Deal "would be at low risk to reoffend."

The board in its decision declared that it had "considered a risk and needs assessment," and considered Packer's testimony and findings. Yet, nowhere in its decision did it address why it rejected the risk assessment by the Department of Correction or the HCR-20 test, or Packer's expert opinion regarding the risk of recidivism. The board is not required to accept the low

recidivism risk determined by a risk assessment or opined by a prisoner's expert. See Doe, Sex Offender Registry Bd. No. 10800 v. Sex Offender Registry Bd., 459 Mass. 603, 637 (2011) ("The opinion of a witness . . . need not be accepted by the hearing examiner . . ."). But where it effectively rejects that estimation of risk by denying parole, it should explain why and identify the evidence it relied on to find a higher estimation of risk. See Doe, Sex Offender Registry Bd. No. 23656 v. Sex Offender Registry Bd., 483 Mass. 131, 136 (2019), quoting Police Dep't of Boston v. Kavaleski, 463 Mass. 680, 694 (2012) ("an agency must 'explain[] on the record its reasons for rejecting portions of [an expert's] testimony'"). See also Langlitz v. Board of Registration of Chiropractors, 396 Mass. 374, 381 (1985), citing Arthurs v. Board of Registration in Med., 383 Mass. 299, 310 (1981) ("an agency or board may not sit as a silent witness where expert testimony is required to establish an evidentiary basis for its conclusions"); New Boston Garden Corp. v. Assessors of Boston, 383 Mass. 456, 470 (1981) ("The board may not reject [the] testimony without a basis for such rejection in the record"); Robinson v. Contributory Retirement Appeal Bd., 20 Mass. App. Ct. 634, 639 (1985) ("where . . . there is uncontradicted testimony concerning a subject which is beyond the common knowledge and experience of the finder of fact, that testimony may not be rejected without a basis for

such rejection in the record").  Otherwise, without such meaningful individualized analysis, a court cannot ensure that the board has truly considered risk assessments in reaching a parole decision.

I concur in the court's judgment only because, at the time of this parole decision, we had yet to articulate what the board must do to demonstrate through its findings that it gave meaningful individualized consideration to the Miller factors and the likelihood that age and maturity will diminish these attributes of youth and reduce the risk of recidivism.  In the absence of this guidance, where the board declared that it considered all that it should consider, I cannot say that it abused its discretion in denying parole.  And I recognize that Deal is entitled to a new parole hearing in December 2020 where, if his parole were denied, we would expect meaningful individualized findings that are far less conclusory and perfunctory than here.